## COLUMBIA GAS TRANSMISSION CORPORATION, Plaintiff,

v.

**LARRY H. WRIGHT, INC., Larry H. Wright, Richard Cameron and James Cameron d/b/a Cameron Brothers, a partnership, John H. McConnell, William N. McLaughlin, Donald H. Malenick, B. J. Armstrong, Robert Klein, Fritz Schmidt, Charles R. Dodson, John D. Montgomery, and Callander and Kimbrell, Inc., Defendants.**

Civ. No. C–2–76–806.

United States District Court, S. D. Ohio, E. D.

March 22, 1977.

**16**

John V. Barger, III, Columbus, Ohio, for plaintiff.

John C. Elam, Michael G. Long, R. Douglas Callander, Columbus, Ohio, for defendants.

## MEMORANDUM AND ORDER

DUNCAN, District Judge.

Plaintiff Columbia Gas Transmission Corporation alleges by its complaint that the defendants have breached various contracts which concern the production and sale of natural gas. Plaintiff seeks specific performance and damages as relief for the alleged breaches. The contracts involved are two advance payment contracts, dated February 5 and May 21, 1973 (and later amended), and 19 gas purchase agreements. One of the gas purchase agreements was executed in April, 1972; the other 18 were executed in 1973 and 1974. Under 28 U.S.C. § 1332(c), the plaintiff corporation is a citizen of the States of Delaware and West Virginia. The defendants are citizens of the State of Ohio. The amount in controversy exceeds $10,000.00 exclusive of interest and costs. This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1). The law of Ohio governs the substantive rights of the parties.

The Court has received evidence from the parties concerning plaintiff's application for preliminary injunctive relief. The Court sets forth hereinbelow its findings of fact and conclusions of law, in accordance with Rule 52(a), Fed.R.Civ.P.

Plaintiff is a party to each of the advance payment contracts and gas purchase agreements. Defendant Larry H. Wright, Inc., is a party to the advance payment contracts. Larry H. Wright, Inc. and the remaining defendants are parties (or corporate officers of parties) to the gas purchase agreements, assignees of parties to these agreements, or owners of part interests in some of the 32 natural gas wells to which the purchase agreements pertain.

Under the amended advance payment contracts, which were drafted by plaintiff, Columbia Gas Transmission Corporation

agreed to loan Larry H. Wright, Inc. an amount of money to be calculated by reference to the proven gas reserves at 20 locations in three townships in Muskingum County, Ohio. Larry H. Wright, Inc. was to use the loan proceeds to drill wells. In return for these loans or advance payments, Larry H. Wright, Inc. agreed (1) to commit all of the gas reserves it then owned or thereafter acquired in the three townships to plaintiff by executing gas purchase agreements, (2) to construct gas lines from the wells to plaintiff's gathering line, and (3) to repay all the loans or advance payments within twenty-four months. The advance payment contracts further provided that for 24 months plaintiff would withhold 50% of the total working interest revenues due Larry H. Wright, Inc. for gas produced and sold to plaintiff, and would apply the withheld amounts as repaid principal on the loans. The balance of the loans not repaid at the end of the 24-month period would become due and payable on demand by plaintiff, with the unpaid balance at the time of such demand bearing interest at the rate of 6% per annum compounded monthly for the 24-month period of the contracts.

The gas purchase agreements were also drafted by plaintiff. Most, but not all, of these 19 agreements were executed after the two advance payment contracts and most, but not all, concerned wells covered by the advance payment contracts. Each of the 19 agreements included the following language:

. . . Seller hereby agrees to sell to Buyer [Columbia Gas Transmission Corporation] all the natural gas that may be purchased or produced and saved by Seller from oil and/or gas wells located on leaseholds now held and operated or which may hereafter be operated by Seller in [geographical description] and Buyer agrees to purchase and take all of said gas, except gas used for operating purposes and gas utilized by Lessors for domestic purposes.

. . . . .

Seller agrees not to dispose of any of the gas produced from said Leaseholds to any other company or persons during the existence of this Agreement, but this covenant shall not interfere in any way with Seller's use of gas for operating purposes on said premises.

Article 2 of each purchase agreement established the productive life of the well or wells involved as the term during which the agreement would remain in effect. Article 11 set a fixed purchase price for each million cubic feet of gas delivered per month. The same article included a purchase price opener clause which required an adjustment of the contract price "in the event an increase in the purchase price paid for gas produced in the State of Ohio is made by Buyer within one year from the date of this Agreement."

This case concerns the following wells:

| | | | |
|---|---|---|---|
| (1) | Ewan | (17) | Houston 1 |
| (2) | Gatewood | (18) | Houston 2 |
| (3) | Ward 1 | (19) | Phillips |
| (4) | Ward 2 | (20) | Long |
| (5) | Zinn 1 | (21) | Ballard-Wishart |
| (6) | Zinn 2 | (22) | Darr 1 |
| (7) | Norman | (23) | Darr 2 |
| (8) | Vickers | (24) | Dickerson |
| (9) | B. Lapp 1 | (25) | Gillett 1 |
| (10) | Ferrell | (26) | Gillett 2 |
| (11) | Gosser | (27) | B. Lapp 2 |
| (12) | L. Lapp | (28) | B. Lapp 3 |
| (13) | Johnson | (29) | B. Lapp 4 |
| (14) | Shirer | (30) | Peterson |
| (15) | Sarbaugh 1 | (31) | Senter 1 |
| (16) | Sarbaugh 2 | (32) | Senter 2 |

For the sake of convenience, the Court will refer hereinbelow to the wells by parenthetical number rather than by name.

Using the "proven gas reserves" formula set out in the advance payment contracts, Columbia Gas Transmission Corporation loaned Larry H. Wright, Inc. $329,807.94 in 1973 and 1974. Of that amount, $230,169.64 was advanced under the May 21, 1973, contract; the balance was advanced under the February 5, 1973, contract. The May 21 contract, as finally amended, concerned wells (1) through (8). The February 5 contract, as finally amended, concerned wells (9) through (20). Neither advance payment contract concerned wells (21) through (32).

Individually or through a limited partnership, six of the defendants (Messrs. Arm-

strong, Klein, McConnell, McLaughlin, Malenick and Schmidt) invested $1,097,744.00 (of which $529,400.00 represented secured loans from a bank) in all of the 32 wells except wells (14) and (21).

On July 8, 1974, Mr. J. Ball, an employee of plaintiff Columbia Gas Transmission Corporation, removed the gas delivery chart from the Wright-B. Lapp deduct meter, which gauged the June 6, 1974, to July 8, 1974, production of a well or wells (the evidence is not clear which well or wells) involved in this litigation. Such meters show both an index reading and a chart reading; these should correlate if the meter is functioning properly. Mr. Ball wrote on the back of the Wright-B. Lapp deduct meter chart for that period, "Index reading correct, chart has been tampered with." On the September 7, 1974, chart of the Wright-Johnson deduct meter, concerning the previous month's production from well (13), Mr. Ball wrote, "Index reading correct, chart was tampered with." On the October 8, 1974, chart of the Wright-Houston deduct meter, concerning the previous month's production from wells (17) and (18), Mr. Ball wrote, "Reading correct, chart has been moved ahead (by?)." Although each of these charts was delivered to plaintiff's data processing channels and each formed the basis for contractual payments for gas delivered, Columbia Gas Transmission Corporation did not act in 1974 to determine if a delivery measuring problem existed. It did not lock its metering stations (as was commercially feasible) or make any other security efforts. It did not inform Larry H. Wright, Inc. or the other defendants that a potential problem existed until late 1975 and early 1976, when plaintiff informed defendant Larry Wright that some of the meter readings seemed to be erroneous. Wright and his employees checked meters, finding some leaks and some meters which were not operating.

By letter dated May 20, 1976, Mr. Charles E. Cozad, plaintiff's director of gas procurement, informed defendant Larry Wright that $122,697.71 was outstanding on the two 1973 advance payment contracts. He noted that these contracts provided that if the money advanced was not fully repaid within 24 months, "the balance not recovered shall become due and payable upon demand by Columbia." Plaintiff did not make a demand for the money; Mr. Cozad said only that "we would appreciate your prompt attention to this matter."

It was not until a June 7, 1976, meeting that Larry Wright was informed of plaintiff's belief that some meters had been tampered with. Mr. Wright denied any knowledge of or complicity in the alleged tampering. Mr. A. Belcastro, one of plaintiff's division managers, sent defendant Mr. Wright a letter dated June 10, 1976, which, he wrote, was "to confirm our [June 7] discussion on tampering with the meters at the Wright Shirer, Lapp, Zinn and Ward measuring stations." He wrote, "The charts and indexes at these stations were turned by hand to increase the flow to approximately 10 to 20 times the normal monthly delivery." He promised that plaintiff would "review the charts for the past year to correct over-payments which were caused by moving the chart and index ahead." He wrote that according to plaintiff's information the tampering "started about April of 1975." He stated, "We have sealed the index on these four (4) measuring stations." He closed by calling the alleged tampering "a serious matter" and urging Wright to bring it to the attention of his employees.

On or about June 20, 1976, Larry H. Wright, Inc. received its last payment for gas delivered to plaintiff under the 19 gas purchase agreements. The payment covered gas metered between April 10, 1976 and May 10, 1976.

By phone on July 21, 1976, and by letter dated July 22, 1976, Columbia Gas Transmission Corporation advised Larry Wright that it was going to withhold all payments to Larry H. Wright, Inc. until the estimated overpayments were recovered. The letter, signed by Charles E. Cozad, stated that "for some period of time discrepancies in the meter recordings almost certainly have resulted in overpayment to you." He an-

nounced that all contractual payments owing Larry H. Wright, Inc. on July 20, 1976, were "being withheld and applied to the overpayment pending further investigation."

On August 10, 1976, at plaintiff's request, defendant Larry Wright attended a meeting at plaintiff's offices in Charleston, West Virginia. At this meeting, he was shown for the first time the meter charts which were suspect. Plaintiff told Wright that it was owed a total of $335,053.43 (including unrecovered advance payment money). On August 27, 1976, Larry Wright sent plaintiff a letter stating that unless payments for gas being delivered were forthcoming, the defendants would be forced to seek "alternate markets for our gas production or plug and abandon some of the wells."

On October 7, 1976, plaintiff hired Mr. Daniel R. Fulton to study the meter charts and records in question. Mr. Fulton later concluded that 68 different metering charts, from 11 different metering stations, were intentionally falsified between April 9, 1975, and May 28, 1976. He testified before this Court that a "significant amount" of overpayments was involved, and that perhaps 326,000 MCF (thousand cubic feet) had been paid for but not delivered. Plaintiff claims that this amounts to approximately $179,000.00 worth of gas.

In early October 1976, defendants Larry Wright and William McLaughlin met with representatives of plaintiff in Charleston. They requested that plaintiff resume payments for gas as it was delivered; plaintiff refused. Over a period of time from August through November 1976, after having received no payment for gas delivered since May 10, 1976, defendants ceased delivering gas to plaintiff. Gas from wells (9), (12), (13), (17), (18), (27), (28) and (29) was diverted and sold to others. Wells (2), (3), (4), (5), (6), (14), (15), (16), (19), (20), (21), (22), (24), (25), and (30) were shut in.

■ Plaintiff filed this action on November 9, 1976, alleging that it was entitled to all gas subject to the advance payment contracts and the gas purchase agreements. The Court is in agreement with plaintiff when it contends that the rights and duties of the parties under the advance payment contracts and the gas purchase agreements are governed by Ohio's version of Article 2 of the Uniform Commercial Code, R.C. 1302.01 through 1302.98. The purchase and sale of natural gas lie at the heart of the two advance payment contracts; the promise by Larry H. Wright, Inc. to enter into gas purchase agreements was an essential part of the consideration flowing to plaintiff under these contracts. R.C. 1302.02 [UCC § 2–102] provides that Ohio's Article 2 applies "to transactions in goods." R.C. 1302.03(A) [UCC § 2–107(1)] in turn provides as follows:

> A contract for the sale of timber, minerals, or the like or a structure or its materials to be removed from realty is a contract for the sale of goods within sections 1302.01 to 1302.98, inclusive, of the Revised Code, if they are to be severed by the seller but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell.

The 1972 Uniform Commercial Code amendments, which Ohio has not as yet adopted, added "(including oil and gas)" after the words "minerals or the like." Even in the absence of the 1972 amendment, I am convinced that the language "minerals, or the like . . . if they are to be severed by the seller," found in R.C. 1302.03, does apply to the subject matter of the contracts and agreements involved here.

■ Taking into account the preliminary nature of the hearing held in this case, I am convinced that plaintiff has demonstrated a likelihood of success concerning its allegation that scores of meter charts from 11 different metering stations were intentionally altered. Plaintiff argues that a finding of tampering is "analogous" to a finding of breach of contract, such that R.C. 1302.91 [UCC § 2–717], permitting deduction of damages from an unpaid contract price, is applicable. Perhaps typical of the clarity of Article 2 of the Uniform Commercial Code, although a "breach of contract" is the triggering event for purposes of § 2–

717, the term is nowhere defined in the Code. R.C. 1302.60 [UCC § 2–601] may come closest with its conditional clause, "if the goods or the tender of delivery fail in any respect to conform to the contract." This is a seller's "breach of contract" under the Code. The gas purchase agreements were "output contracts" under the Code, see R.C. 1302.19 [UCC § 2–306]; the essence of these agreements was that plaintiff would buy, and defendants would sell, all the natural gas produced at the wells covered by the agreements. The evidence discovered by plaintiff concerned tampering with meters which were contractually under *plaintiff's* control (see Article 9 of the agreements, quoted in part hereinbelow); plaintiff offered no evidence, and apparently has none, which tends to show who altered the charts. Such a factual posture will not, in my judgment, support a finding or conclusion that either the goods supplied by defendants or the defendants' tender of delivery failed in any respect to conform to the contracts. R.C. 1302.91 [UCC § 2–717] is not a general set-off provision permitting a buyer of goods to adjust its continuing contract obligations according to the equities perceived by the buyer. The buyer must incur damages resulting from a *breach of contract* before UCC § 2–717 permits it to deduct anything from the contract price; plaintiff has not demonstrated a likelihood of success concerning proof of such a breach.

◼ Plaintiff next turns to the failure of Larry H. Wright, Inc. to repay within 24 months the advancements made by plaintiff under the February 5, 1973, and May 21, 1973, advance payment contracts. The relevant term of each contract is unambiguous: "If the monies advanced by Columbia to Wright are not fully recovered by twenty-four (24) months from start of repayment, the balance not recovered shall become due and payable upon demand by Columbia." Plaintiff's reliance upon this term and upon defendant's admitted failure to repay the

advancements within the prescribed period as support for its refusal to pay for gas delivered after May 10, 1976, is misplaced for two reasons. First, plaintiff never made the contractually required demand for payment.[1] The unpaid balance never became "due and payable." Second, plaintiff attempted to set off its (potential) rights under the advance payment contracts against its duties under the gas purchase agreements. Having drafted these two sets of contracts, plaintiff cannot ignore their independent legal significance. The advance payment contracts were loan agreements, not gas purchase agreements. The promise by Larry H. Wright, Inc. to enter into gas purchase agreements would have been superfluous if the advance payment contracts were in fact gas purchase agreements. It is true that the method of repayment of the loans was tied to the purchase and sale of gas under some of the 19 agreements; this alone does not render a latent breach of the advance payment contracts applicable to the gas purchase agreements.

◼ Plaintiff's final attempt to demonstrate a breach by defendants concerns its contention that the gas purchase agreements were installment contracts under R.C. 1302.70(A) [UCC § 2–612(1)]. The Court assumes, arguendo, that plaintiff's characterization of these agreements as installment contracts is correct. Whether or not installment contracts are involved, R.C. 1302.77 [UCC § 2–703] permits a seller to cancel the contract, withhold delivery and resell only if

> the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole . . . .

This is a Code definition of a buyer's breach. Plaintiff neither rejected the gas delivered nor repudiated its acceptance of the goods, see R.C. 1302.61 [UCC § 2–602] and R.C. 1302.66 [UCC § 2–608]. Nor did

---

1. Plaintiff did make a belated, oral demand for the unrecovered advance payments at the August 10, 1976, meeting in Charleston, West Virginia. During the previous month, plaintiff had begun withholding all payments for present gas deliveries; thus, plaintiff acted to set off the unpaid balance under the advance payment contracts before the balance became due.

plaintiff "fail to make a payment due on or before delivery." The payments under the gas purchase agreements were to be made *after* the goods were delivered. The sole remaining kind of breach mentioned by R.C. 1302.77 [UCC § 2–703] as permitting cancellation, withholding and resale is a "repudiation" by the buyer. "Repudiation" is another term not defined by the Code, although UCC § 2–610 [R.C. 1302.68] carries "Anticipatory Repudiation" as a heading and sets out permissible courses of action by an aggrieved party if the other party "repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other." Discussing the word "repudiates" as it appears in the definition of a buyer's breach, R.C. 1302.77 [UCC § 2–703], Professor Nordstrom comments:

The Code does not define "repudiation," but the word is used in the sense of an anticipatory breach—a breach occurring prior to the time that buyer is obligated to accept and pay the price. Thus, the section 2–703 index of remedies is available to a seller whenever the buyer failed to make a payment which was due on or before delivery or when the buyer defaulted by indicating that he would not

perform his obligations when they become due.

R. Nordstrom, Law of Sales § 162 at 489 (1970). This Court reads UCC § 2–703 in the same fashion. Read literally, this section does not label as a breach a buyer's failure to pay the contract price if the contract calls for payment after the goods are delivered. This loophole, coupled with the fact that Columbia Gas Transmission Corporation had reasonable grounds to believe it had paid for gas which had not been delivered, convinces the Court that as to the purchase agreements on which it had overpaid, plaintiff's refusal to pay the post-May 10, 1976, contract price until overpayments were recovered did not trigger the sellers' remedies set out at R.C. 1302.77 [UCC § 2–703]. See *Gulf Oil Corporation v. Lone Star Producing Co.,* 322 F.2d 28, 31 (5th Cir. 1963) (citation omitted): "Money paid under a mistake of fact can be recovered."

■ Plaintiff went further, however, than stopping present payments for gas flowing from those wells at which it had evidence of tampering. It stopped present payments on all 19 agreements. And it announced an intention to recoup all unrecovered advance payments under the two contracts it had with Larry H. Wright, Inc.[2]

---

**2.** Plaintiff's July 22, 1976, letter from Mr. Cozad to Larry H. Wright, Inc., can be read to have no application to the advance payment contracts. The caption of the letter sets out the account numbers of 17 gas purchase agreements. Mr. Cozad stated that "all payments from us to you, *as described above,* . . . are being withheld and applied to the *overpayment* . . . ." (Emphasis supplied.) This letter, standing alone, would not appear to indicate an intention on the part of plaintiff to set off the unrecovered advance payments against presently accruing liabilities for gas delivered.

Mr. Debaets testified that he does not recall any statement by plaintiff that it was stopping payment on the gas purchase agreements because of unrecovered advance payments. Mr. Wright testified that although he was told at the Charleston meeting that Larry H. Wright, Inc. owed plaintiff over $335,000.00, including over $196,000.00 in unrecovered advance payments, he does not recall plaintiff's representatives stating specifically whether the unrecovered advance payments were to be included in the set off.

The Court cannot ignore the briefs and argument of plaintiff. Columbia Gas Transmission

Corporation has consistently aggregated the overpayments and the unrecovered advancements in its briefs and arguments. In its January 11, 1977, brief, at page 7, it goes so far as to argue,

Since there remained an unpaid balance of $196,000 [under the advance payment contracts] after the expiration of the 24 month term, Defendants were in breach of repayment provisions [of the advance payment contracts]. Under Section 1302.91 of the Ohio Revised Code Plaintiff was entitled to deduct this amount from the price [due defendants under the gas purchase agreements].

This non sequitur is evidently based upon an assumption that the advance payment contracts were gas purchase agreements rather than loan agreements, an assumption which I have rejected.

Based upon plaintiff's arguments before this Court, and upon its August 10, 1976, demand for both unrecovered advance payments and alleged overpayments, I find that plaintiff announced an intention in July and August 1976 to set off both overpayments and unrecovered advance payments.

I say again, plaintiff drafted these 21 contracts, and it cannot ignore their independent legal significance. The Court holds that plaintiff's refusal to make current monthly payments for gas delivered by defendants under agreements as to which plaintiff had no evidence of tampering, was a repudiation of *those* agreements under R.C. 1302.77 "UCC § 2–703] which went to the whole of each contract and permitted cancellation, withholding and resale of the goods. The Court further holds that under agreements as to which plaintiff had evidence of tampering, plaintiff's withholding current monthly payments for gas delivered was not a repudiation. As to these latter agreements, plaintiff's insistance upon recovering the unpaid balance of the advance payment contracts did not constitute good faith performance of a merchant under the Code, but in my judgment the announcement of this intention alone did not constitute a repudiation under the Code.

Leaving its allegations of a breach by defendants, plaintiff next asserts that it was contractually authorized under the terms of the gas purchase agreements to engage in the set-off procedure which it chose. Article 9 of each of the 19 agreements included the following language:

Buyer shall read the meter, furnish, place, and remove any and all recording gauge charts, calculate the deliveries, and perform any other service necessary in connection with the measurement of said gas, without cost to Seller, except as hereinbefore provided. Should Seller challenge the accuracy of the measuring device or devices used, Buyer shall furnish a comptent [sic] inspector to make an inspection of the measuring device or devices, at which inspection, a representative of Seller may be present. For any test or inspection, any resultant aggregate error exceeding two per cent (2%) of computed delivery shall be adjusted, insofar as exact knowledge of such errors or contributing causes is obtainable. Such adjustments to be made for a period of not to exceed thirty (30) days previous to the date of the challenge by Seller. Upon written request from Seller, copies

of meter charts shall be forwarded to Seller for inspection, subject to return to Buyer within ten (10) days after receipt thereof. Buyer shall keep them on file for three (3) years after date of delivery, during which time they will be open for inspection by authorized parties at any and all times.

In drafting the gas purchase agreements, then, Columbia Gas Transmission Corporation reserved to itself the obligation of measuring the gas delivered. Although express provisions in the agreements addressed the contingency of a dispute, originating with the *seller,* concerning the accuracy of the delivery measurements, plaintiff drafted no terms addressing the contingency of the *buyer* challenging the accuracy of the delivery measurements.

Plaintiff cites not Article 9 of the agreements, but Article 8, for its contention that "the terms of the contracts authorized Columbia to make adjustments in payments for delivered gas." Article 8 of each agreement provides, in pertinent part, as follows (emphasis added):

Failure of the seller [defendants' to promptly correct *conditions within its control* contributing to the inaccurate measurement of gas, shall constitute sufficient grounds for Buyer [plaintiff] to temporarily discontinue marketing gas until such conditions have been corrected by Seller. Buyer may adjust computed deliveries to correct for inaccurate measurement caused by *such conditions,* but only where such inaccuracies exceed two (2) per cent of computed deliveries.

This provision concerns only conditions within defendants' control; the measuring of gas under these agreements was within the general responsibilities of plaintiff. Absent proof that the meter tampering was a result of conditions within the defendant sellers' control, the language cited by plaintiff in Article 8 is of no help to its cause. Furthermore, this language in each agreement must be applied to the deliveries made under each separate agreement. Even if the suspect measurements were attributable to the sellers, Article 8 would permit

"adjustments" of computed deliveries only as to gas delivered under those contracts which pertained to wells at which inaccuracies were discovered. Finally, the Article 8 provisions of the gas purchase agreements have no bearing upon the separate advance payment contracts; plaintiff's inclusion of the unrecovered loan proceeds as part of the set off draws no support from Article 8.

■ R.C. 1301.09 [UCC § 1–203] imposes upon all persons who are parties to an Article 2 contract "an obligation of good faith in its performance or enforcement." Since Columbia Gas Transmission Corporation is a merchant engaged in the business of procuring and distributing natural gas, see R.C. 1302.01(A)(5) [UCC § 2–104(1)], its obligation of good faith is defined by R.C. 1302.01(A)(2) [UCC § 2–103(1)(b)] (emphasis supplied) as "honesty in fact and the observance of *reasonable commercial standards* of fair dealing in the trade." Plaintiff's insistence, without evidence of tampering on the part of any of the defendants, that it recover ·both its estimated overpayments *and* its unrecouped advance payments before paying *anything* toward current gas deliveries not only was an overreaching of its rights under the applicable contracts and the Code, but also was commercially unreasonable action under the factual posture of this case. This position ignored defendants' need for a present cash flow. It penalized all defendants under all contracts for overpayments and indebtedness arising under only some of the contracts. As a merchant under the Code, plaintiff should have sought a negotiated middle-ground when a factual dispute arose under contracts it had drafted, rather than insisting that it have the gas now and its money, too.

Because I view the foregoing discussion to set forth the law applicable to the facts of this case, I do not believe that plaintiff has demonstrated that it is likely to succeed on the merits of its request for specific performance of the contracts involved in this case. Columbia Gas Transmission Corporation repudiated a number of the gas purchase agreements, thereby entitling the other parties to those agreements to cancel and resell. Plaintiff acted in a commercially unreasonable manner with respect to all 19 agreements, and therefore in bad faith under the Code, by insisting that it recoup all overpayments and unrecovered advancements before resuming any payments for present deliveries of gas. Plaintiff, then, has not shown a likelihood of success concerning its claim that defendants wrongfully diverted some of the gas production and shut in the rest.

■ Nor do I believe that Columbia Gas Transmission Corporation has proved that it will be irreparably harmed if injunctive relief is not granted during the pendency of this action. In a pretrial brief, plaintiff argues as follows:

> There is no doubt that there is a threat of irreparable harm to the Plaintiff if the preliminary relief is not granted. This country is facing a tremendous natural gas shortage, and central Ohio is experiencing severe cut-backs and curtailments of natural gas. The gas which was being delivered by the Defendants to Columbia pursuant to the agreements between the parties, had been dedicated to Columbia for use in Ohio. A portion of that gas is not shut in and the general public is thus denied access to this energy source. The other portion of the gas is being diverted and sold to the East Ohio Gas Company which services an entirely different area of the country. This Court can take judicial notice of the Federal Power Commission hearings and regulations as well as the regulations promulgated by the Public Utilities Commission for the state of Ohio. Proceedings before these two bodies establish conclusively that Columbia has been required to curtail delivery of gas to its various customers. If Columbia additionally loses the gas which is being produced by these 23 wells which are the subject of this litigation, both Columbia and its customers will suffer even further.

These are plaintiff's words; its actions speak louder. Defendant Larry Wright's August 27, 1976, letter advised plaintiff

that defendants would continue supplying plaintiff with gas under the 19 purchase agreements if Columbus would resume payment for present deliveries. Plaintiff, then, was assured of receiving the natural gas if it would leave the question of overpayments and unrecovered advancements to another day, when by agreement or by litigation the dollar questions could be resolved. The only thing standing between Columbia and the gas was money; if loss of the gas would have constituted true irreparable harm to plaintiff, it would have paid the money and brought an action for the debt and for an accounting.

Plaintiff's proofs are silent concerning the precise effect upon its operations which the loss of the gas would have. Mr. Debaets, plaintiff's Vice-President for Operation for the Northern Region, testified:

A. Well, I don't think that fifty million cubic feet or thereabouts or the gas that is, let's see, or approximately about thirty million cubic feet that has been diverted and shut in is an insignificant amount.

Q. What part of one percent does that represent of Columbia's yearly needs?

A. I haven't figured that out.

Q. You can't tell the Court any ball-park figure as to how much gas is consumed in Ohio by Columbia customers in one year?

A. No, sir.

Q. Do you have any estimate at all?

A. No, sir.

. . . . .

[B]y diverting and shutting in this gas flow we were deprived of whatever percentage, fraction of a percent, that it represents in our total supply. That particular gas was irreplaceable.

The only other evidence in the record on this point is defendant Larry Wright's testimony. Mr. Wright, employed by plaintiff as a production engineer for six years, until 1971, testified that the gas production from the wells covered by the 19 agreements probably involved less than one one-hundredth of one percent of the gas that plaintiff is "obtaining this year [1976] in the State of Ohio."

Plaintiff cites no authority for its proposition that alleged irreparable harm to its customers is cognizable in an action brought by Columbia Gas Transmission Corporation. Plaintiff is engaged in the purchase and distribution of natural gas for profit. Nothing in the record indicates that plaintiff itself will lose anything more than profits if preliminary injunctive relief is denied. Lost profits are recoverable at trial as a judgment for damages.

Plaintiff has not shown that it cannot obtain natural gas from others to cover defendants' alleged wrongful cancellations. The Court can take judicial notice of the shortage of natural gas, and still not know whether supplies of this resource are available from others, albeit at greater cost. Plaintiff has failed to show that its remedies for money damages under R.C. 1302.87 [UCC § 2–713] would be inadequate if it does establish at trial that defendants are liable for nondelivery or repudiation. As is stated in *Laclede Gas Company v. Amoco Oil Company,* 522 F.2d 33, 39–40 (8th Cir. 1975) (citation omitted), "It is axiomatic that specific performance will not be ordered when the party claiming breach of contract has an adequate remedy at law." The *Laclede* court, in finding no adequate remedy at law, noted the expert testimony adduced by the plaintiff in that case to the effect that "Laclede probably could not find another supplier of propane willing to enter into a long-term [requirements] contract such as the Amoco agreement, given the uncertain future of worldwide energy supplies." Columbia Gas Transmission Corporation has not laid such a careful record. *Laclede* is distinguishable from the present case on this and other factual grounds.

The Uniform Commercial Code, R.C. 1302.90 [UCC § 2–716] is, in the words of the drafters in the official comments, an effort "to further a more liberal attitude than some courts have shown in connection with the specific performance of contracts

of sale." The comments continue with the statement, "Output and requirements contracts involving a particular or peculiarly available source or market present today the typical commercial specific performance situation, as contrasted with contracts for the sale of heirlooms or priceless works of art which were usually involved in the older cases." The statutory language used by the drafters, R.C. 1302.90(A) [UCC § 2–716(1)], is not as clear on this point as the drafters apparently intended: "Specific performance may be decreed where the goods are unique or in other proper circumstances." One court has stated, "[t]he Code comments, in conjunction with prior case law, decisions in other jurisdictions, and the general trend toward more liberalized availability of specific performance, persuade this court that the remedy should be available when goods cannot be covered or replaced." *Kaiser Trading Co. v. Associated Metals & Minerals Corp.*, 321 F.Supp. 923, 932–33 (N.D.Cal.1970), *appeal dismissed* 443 F.2d 1364 (9th Cir. 1971). Although the *Kaiser Trading* court's analysis may well be a proper interpretation of the Code for purposes of a trial on the merits, I do not agree with its application of the more liberal specific performance standards to a motion for preliminary injunctive relief. Such extraordinary relief should be granted only if the movant has established each of the well-settled standards applicable to such motions, see *Winkleman v. New York Stock Exchange*, 445 F.2d 786, 789 (3d Cir. 1971), one of which is a showing of irreparable harm.

The motion for preliminary injunction is denied.