In re **PITTSBURGH–CANFIELD CORPORATION, et al.,**
Debtors.

**Interstate Gas Supply, Inc., Plaintiff,**

v.

**Wheeling Pittsburgh Steel Corporation, Defendant.**

Bankruptcy No. 00–43394.
Adversary No. 00–4157.

United States Bankruptcy Court, N.D. Ohio.

July 23, 2002.

Guy R. Humphrey, Jeffrey L. Small, Chester, Willcox & Saxbe, LLP, Columbus, OH, for Interstate Gas Supply, Inc.

Michael E. Wiles, Richard F. Hahn, Debevoise & Plimpton, New York City, James M. Lawniczak, Scott N. Opincar, Calfee, Halter & Griswold, LLP, Cleveland, OH, for Pittsburgh–Canfield Corp.

234

Ira Bodenstein, Cleveland, OH, U.S. Trustee.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Chief Judge.

This cause is before the Court on the motion of Debtor/Defendant Wheeling–Pittsburgh Steel Corporation ("Defendant") for summary judgment. Plaintiff Interstate Gas Supply, Inc. ("Plaintiff") filed a response opposing the motion. Supplemental papers and responses have been filed. The motion and Plaintiff's response are supported by deposition transcripts, transcripts of telephone conversations,[1] affidavits, invoices and correspondences between the parties. Guy R. Humphrey, Esq. appears on behalf of Plaintiff. Scott N. Opincar, Esq. appears on behalf of Defendant. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (C). The following constitutes the Court's findings of fact and conclusions of law pursuant to FED. R.BANKR.P. 7052.

## DISCUSSION

### A. Standard of Review.

The procedure for granting summary judgment is found in FED.R.CIV.P. 56(c), made applicable to this proceeding through FED.R.BANKR.P. 7056, which provides in part that:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Evidence submitted on summary judgment is viewed in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is not proper if there is a material dispute over the facts, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. Facts.

This action arises between two parties with a three year history of natural gas sales transactions. *See Interstate Gas Supply, Inc. v. Wheeling Pittsburgh Steel Corp. (In re Pittsburgh–Canfield Corp.),* Adversary No. 00–4157, Memorandum Opinion at 4 (Sept. 12, 2001). Plaintiff is an Ohio corporation that is in the business of marketing and selling natural gas. *See id.* at 3. Defendant produces and refines steel, using large quantities of natural gas. *See id.* at 3–4. Plaintiff was one of Defendant's suppliers. *See id.* at 4. It is undisputed that on October 11, 2000, Plaintiff and Defendant signed an agreement involving the sale of natural gas between November 1, 2000 and December 31, 2000 ("the Agreement"). *See* Defendant's

---

1. Both parties rely upon transcripts of telephone conversations taped by Plaintiff. Stephen Casciani authenticated the telephone transcripts. *See* Plaintiff's Supplement to

Memorandum Contra to Defendant's Motion for Summary Judgment, Casciani Affidavit at 5.

Memorandum in Support of Motion for Summary Judgment or, in the Alternative, Pretrial Memorandum ("Def.'s Summ. J.Mem."), Exhibit A. The Agreement included "net seven" payment terms. *See id.*

It is undisputed that, as of November 16, 2000, Defendant had not paid Plaintiff for October and early November gas sales. There is no evidence within the record of specific payment terms or deadlines for October gas transactions. In a telephone conversation on November 16, 2000, Plaintiff stated "[I]f we don't see a check like in the next day, um, its going to be hard for [us] not to do something." Plaintiff's Trial Brief and Memorandum Contra to Defendant's Motion for Summary Judgment ("Pl.'s Mem. Contra"), Exhibit WW at 3. During the November 16, 2000 telephone conversation, the parties also agreed that Plaintiff would write a letter stating that if it did not receive payment for the October and early November gas deliveries by "tomorrow," or November 17, 2000, then gas deliveries would stop. *See id.* Plaintiff did write this letter. The letter stated "if we do not receive payment by close of business Friday November 16, 2000[sic] IGS will suspend deliveries of gas supplies until satisfactory payment can be made." Def.'s Summ.J.Mem., Ex. H. Plaintiff's letter incorrectly referred to November 16, 2000 as a Friday, when in actuality Friday correlated with November 17, 2000. *See id.*

On November 16, 2000, Defendant filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Defendant called Plaintiff, on November 16, 2000, to explain the filing of a bankruptcy petition and to seek continued future sales of natural gas from Plaintiff. *See* Pl.'s Mem.

Contra, Ex. YY at 1. It is undisputed that Plaintiff did not ship any gas on behalf of Defendant after the filing of the bankruptcy petition.

In late November (November 28 or 29, 2000), one of Plaintiff's representatives, Steve Casciani, called Terry Peters, Defendant's representative, to discuss December pricing. *See* Responses of Plaintiff to Defendant's First Set of Interrogatories and Requests for Production at No. 1; *see also* Def.'s Summ.J.Mem., Ex. J.[2] During the conversation, both parties agreed that "everything we do at this point is a new contract[.]" Def.'s Summ.J.Mem., Ex. J at 6. Negotiations failed. The parties could not agree to December basis and margin amounts and Plaintiff did not sell any additional gas to Defendant.

Plaintiff filed an adversary complaint. Defendant counter-claimed. This Court previously overruled Plaintiff's motion for partial summary judgment. Defendant now seeks summary judgment on all issues and further seeks interest and attorneys' fees.

### C. Issues.

This Court must determine: (1) whether Plaintiff is a utility; (2) whether the Agreement for the sale and delivery of gas ended prior to Defendant's bankruptcy petition filing; (3) whether any portion of the amount that Defendant owes Plaintiff under the Agreement qualifies for administrative expense priority and (4) whether Plaintiff is liable for the "cover" cost of gas purchased from other sources by Defendant, interest and attorneys' fees.

### D. Analysis.

#### 1. *Plaintiff's public utility status is moot and without controversy.*

Plaintiff argues that it is not a public utility, but merely a marketer of natural

---

**2.** Plaintiff's audiotape transcript of this phone conversation represents that the call took place on November 29, 2000, whereas Plaintiff's interrogatory response states that the conversation took place November 28, 2000.

gas. Defendant does not oppose Plaintiff's characterization of itself as a natural gas marketer. *See* Def.'s Summ.J.Mem. at 9. Moreover, Defendant does not oppose Plaintiff's contention that it lacks public utility status. *See id.* The parties' agreement on Plaintiff's lack of public utility status renders this issue moot and without controversy.

### 2. *The Agreement did not end prior to Defendant's bankruptcy petition filing.*

#### a. *An enforceable contract existed.*

Before determining whether a contract ended through breach, the Court must first find that a contract existed. Both parties claim that they entered into an Agreement for the sale of natural gas. *See* Plaintiff's Second Amended Complaint for Declaratory and Other Relief ("Complaint") ¶ 8; Defendant's Answer to the Second Amended Complaint and Amended Counterclaim ("Answer") ¶ 8.

■ The law of Ohio governs the substantive rights of the parties and will determine whether the Agreement is enforceable. Specifically, "gas purchase agreements are governed by Ohio's version of Article 2 of the Uniform Commercial Code, R.C. 1302.01 through 1302.98." *Columbia Gas Transmission Corp. v. Larry H. Wright, Inc.*, 443 F.Supp. 14, 19 (S.D.Ohio 1977). Because this contract involved a sale of goods of more than Five Hundred Dollars ($500.00), the statute of frauds applies.

■ Ohio's statute of frauds requirements, see Ohio Revised Code § 1302.04(A), are met in this case because both parties agree that a signed writing, dated October 11, 2000, sets forth the es-

sential terms of their Agreement.[3] The written Agreement includes: (1) the names and signatures of both parties; (2) specific quantities of gas scheduled for delivery in November and December 2000; (3) the delivery location; (4) payment terms and (5) a system for determining monthly gas prices.

The Agreement leaves open the price terms by stating:

> Buyer will pay Seller $5.41 per Mmbtu plus applicable basis and margin for TCO Pool in November.

> Buyer will pay Seller $5.505 per Mmbtu plus applicable basis and margin for TCO pool in December.

Def.'s Summ.J.Mem., Ex. A. The aforementioned terms refer to prices per one million British thermal units ("Mmbtu"). Def.'s Summ.J.Mem. at 2 n. 1. The terms "basis" and "margin" are industry terms allowing a natural gas supplier to recover the costs of transportation and a market-based profit margin from customers. Applicable basis and margin amounts for a given month are typically determined during the final week of the previous month, "bid week." *See* Complaint at 2; Def.'s Summ.J.Mem., Ex. C at page 18, lines 12–24. For example, the final November 2000 price of $5.78 per Mmbtu was set during the last week in October. Pl.'s Mem. Contra, Ex. BB.

■ Ohio courts have held that "agreements to agree" involving pricing "are enforceable when the parties have manifested an intention to be bound by their terms and when these intentions are sufficiently definite to be specifically enforced." *Oglebay Norton Co. v. Armco, Inc.*, 52 Ohio St.3d 232, 236, 556 N.E.2d 515 (citation omitted). In this case, although the par-

---

**3.** Defendant also claims that the Agreement includes a writing dated October 13, 2000. The terms and conditions within the October 13 document are irrelevant to this proceeding.

ties did not agree to a specific price within the four corners of the written document, they agreed to a method for determining the price. Moreover, "parties if they so intend can conclude a contract for sale even though the price is not settled." OHIO REV.CODE ANN. § 1302.18(A) (Anderson 2002). Accordingly, this Court concludes that an enforceable contract for the sale of natural gas existed prior to the bankruptcy petition filing.

### b. *Pre-petition, Plaintiff was not entitled to Ohio Revised Code § 1302.77 seller's remedies.*

■ Plaintiff argues that it qualified for seller's remedies pre-petition, pursuant to Ohio Revised Code § 1302.77, because the contract ended pre-petition when Defendant defaulted on its payments.[4] *See* Pl.'s Mem. Contra at 4. This Court has previously concluded, in this case, that "performance on the contract was due on both sides as of the petition date[.]" *See Interstate Gas Supply, Inc. v. Wheeling Pittsburgh Steel Corp. (In re Pittsburgh–Canfield Corp.)*, Adversary No. 00–4157, Memorandum Opinion at 8 (Sept. 12, 2001). Notwithstanding this Court's previous statements concerning the status of this contract at petition filing, Plaintiff's arguments in this matter fail to support the conclusion that the contract ended pre-petition.

Ohio Revised Code § 1302.77 states that a seller has access to remedies where: "the buyer [1] wrongfully rejects or revokes acceptance of goods or [2] fails to make a payment due on or before delivery or [3] repudiates with respect to a part or the whole[.]" OHIO REV.CODE ANN. § 1302.77 (Anderson 2002). None of the conditions referred to in § 1302.77 are

supported by evidence in the record of this case. There is no evidence that the buyer rejected or revoked acceptance of goods. There is no evidence that the buyer failed to make a payment "due on or before delivery" because the terms of the contract expressly stated that payment was due seven days after delivery, or net seven. *See generally Columbia Gas Transmission Corp.*, 443 F.Supp. at 20. Moreover, there is no evidence that the buyer repudiated the contract. *See generally id.*

■ Plaintiff argues that Defendant's failure to make payments due on or before November 15, 2000 by November 16, 2000 was a "positive act" sufficient to put Plaintiff "on guard" that Defendant was "repudiating the Agreement and would not perform if further gas was delivered." *See* Pl.'s Mem. Contra at 11. Ohio courts have held that before a seller may seek remedy, a buyer's repudiation must be clear and obvious. "[A] repudiation must be expressed in clear and unequivocal terms[.]" *McDonald v. Bedford Datsun,* 59 Ohio App.3d 38, 40, 570 N.E.2d 299 (8th Dist. 1989). "[A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." OHIO REV.CODE § 1302.68, 1961 Official Comment ¶ 1 (West 2002).

Upon review of the evidence, this Court concludes that Defendant did not express in clear and unequivocal terms an overt intention to repudiate. To the contrary, Defendant repeatedly expressed its intention to continue operating under the contract terms. For example, in a telephone conversation between representatives of

---

**4.** Plaintiff argues that pre-petition the contract was both terminated and cancelled. *See*

Pl.'s Mem. Contra at 9–10.

Plaintiff and Defendant on November 16, 2000, Defendant states:

> [Defendant]: I know I owe you some money.
>
> [Plaintiff]: Yes you do.
>
> ***
>
> [Plaintiff]: [Y]ou can overnight a check?
>
> [Defendant]: I can get you a wire ...
>
> [Plaintiff]: A wire is fine.

Pl.'s Mem. Contra, Ex. WW at 1. Later in the day on November 16, 2000, Defendant states "we need your gas for December and November." Pl.'s Mem. Contra, Ex. XX at 2. Again, at approximately four o'clock in the afternoon on November 16, 2000, Defendant told Plaintiff that it had filed for bankruptcy protection and articulated its intent to receive future gas from Plaintiff.

> [Defendant]: ... we in essence are in bankruptcy at this point in time.
>
> ***
>
> [Defendant]: ... we obviously have the need going forward for natural gas, and we have arranged financing that will allow us to pay, ah, pay current and going forward bills in a prompt manner and we, you know, we need to, to, for you to work with us in terms of supplying gas going forward.

Pl.'s Mem. Contra, Ex. YY at 1. Rather than expressing an intention to repudiate, Defendant voiced its unequivocal intention to continue receiving future gas under the Agreement. Therefore, this Court concludes that Defendant did not repudiate the contract and Plaintiff has not met the requirements for obtaining a seller's remedy under Ohio Revised Code § 1302.77.

### 3. Plaintiff does not qualify for administrative expense priority.

Plaintiff argues that this Court should allow its claim for administrative expense because a portion of the gas it delivered to Defendant pre-petition was used post-petition. *See* Pl.'s Mem. Contra at 16–17. It is undisputed that Plaintiff did not deliver any gas to Defendant post-petition.

Generally, a plaintiff must present evidence of post-petition benefit to the estate to successfully submit an administrative expense claim. Because significant performance remained due by both parties at petition filing, the contract in this matter was executory. *See generally NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521–22 n. 6, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (*superseded by statute on other grounds*). During the post-petition and pre-acceptance period, an executory contract remains in existence and is enforceable by, but not against, the debtor-in-possession. *See U.S. on Behalf of United States Postal Serv. v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 624 (8th Cir.1994); *see also In re LTV Steel Co., Inc.*, Case No. 00–43866, Memorandum Opinion at 7 (July 25, 2001) (citations omitted). Until an executory contract has been rejected, generally a non-debtor must continue to perform. This Court has previously stated that post-petition: " 'the non-debtor party cannot terminate the contract by reason of the debtor's defaults thereunder.' ... It ... follows that the non-debtor party cannot unilaterally elect to cease performance on an executory contract prior to its assumption or rejection." *In re LTV Steel Co., Inc.*, Case No. 00–43866, Memorandum Opinion at 7–8 (July 25, 2001) (citations omitted). If an executory contract is rejected, then the non-debtor has a claim dating from the day before petition filing. *See* 11 U.S.C. § 365(g)(1). To date, Defendant has not rejected, assumed or assigned its interests in the instant contract.

Plaintiff seeks a higher priority claim than what would generally be accorded a pre-petition claimant by asserting

a claim for post-petition administrative expenses. Administrative expenses are permitted for "the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C. § 503(b)(1)(A). The Sixth Circuit applies the "benefit to the estate test" to determine what qualifies as an "actual, necessary" administrative expense. *Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 816 (6th Cir.1997). The test states that a debt qualifies as an actual, necessary expense only if: "(1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate." *Id.* (citations omitted).

 Plaintiff's claimed expense does not fulfill the first requirement of the benefit to the estate test. Plaintiff's claimed administrative expense did not arise from a transaction with the bankruptcy estate. For a matter to arise from a transaction with the bankruptcy estate, it must occur post-petition. Plaintiff admits that it did not deliver gas post-petition. However, even if Plaintiff had delivered gas post-petition, it still would not qualify for an administrative expense priority because the Sixth Circuit has held that administrative priority does not exist when a pre-petition agreement commits a party to pay for an obligation occurring post-petition. *See generally id.* at 817–19. "[I]t is an absolute requirement for administrative expense priority that the liability at issue arise post-petition." *See id.* at 817. In this case, the amount that Defendant owes toward the cost of delivered gas arose pre-petition, because both the Agreement and the gas delivery took place pre-petition. Therefore, this Court concludes that Plaintiff's pre-petition gas transactions do not qualify for administrative expense priority.

### 4. Plaintiff is liable for damages arising from its post-petition breach of the Agreement.

 Defendant counterclaimed that Plaintiff repudiated the contract post-petition. It is undisputed that Plaintiff failed to deliver gas post-petition. After thorough review of the record, reasonable minds could only conclude that Plaintiff breached the Agreement on November 17, 2000 when it repudiated the contract. Plaintiff's repudiation is evidenced by the following telephone conversation of November 17, 2000:

[Plaintiff]: I've been advised by my attorneys not to have any conversations with you guys at this point.

\*\*\*

[Defendant]: Are, are you selling us gas?

[Plaintiff]: At this time we are not.

[Defendant]: You are not?

[Plaintiff]: That is correct.

Defendant's Exhibits, Exhibit 40 at 1. On November 17, 2000, the day after Defendant filed its bankruptcy petition, Plaintiff expressed in clear unequivocal terms that they would no longer deliver gas pursuant to the Agreement. In the days following the November 17, 2000 telephone conversation, it is undisputed that Plaintiff did not sell Defendant gas. Therefore, this Court concludes that Plaintiff repudiated the contract and is liable for damages.

### 5. Plaintiff is liable for Defendant's cover costs.

 Defendant seeks as damages, *inter alia*, the cost for purchasing cover gas in November and December 2000. Although the Agreement involved two months, this Court concludes that the Agreement was one contract. Therefore, damages for the purchase of cover gas in November and December 2000 must be

awarded. Defendant claims that it is entitled to One Million Ninety–Nine Thousand Ninety–Five and 40/100 Dollars ($1,099,095.40) in cover costs. Additionally, Defendant seeks attorneys' fees.

Once a seller repudiates, a buyer may "cover" by purchasing substituted goods "in good faith and without unreasonable delay[.]" OHIO REV.CODE ANN. § 1302.86(A) (Anderson 2002). Moreover, "[t]he buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages [.]" OHIO REV.CODE ANN. § 1302.86(B) (Anderson 2002). In this case, after the seller repudiated the contract, Defendant covered by purchasing gas from other suppliers. Plaintiff presents no persuasive evidence rebutting Defendant's purchase of cover in good faith and without unreasonable delay. Therefore, this Court concludes that Plaintiff is liable for the difference between the cost of cover and the contract price.

### a. November.

Calculating Plaintiff's liability for Defendant's purchase of cover gas in November 2000 is a fairly simple task. To calculate cover costs, the Court must know: (1) the agreed upon contract price per decatherm; (2) the number of cover decatherms purchased and (3) the cover price. Once all of these variables are known, the number of cover decatherms is multiplied by the net cost per decatherm (i.e., the difference between the cover and contract prices). It is undisputed that the agreed upon contract price for November 2000 was Five and 78/100 Dollars ($5.78) per decatherm. Defendant provided documentation supporting its statement that, in November 2000, it purchased seventy-two thousand three hundred four (72,304) decatherms of cover gas from Equitable Energy at Six and 95/100 Dollars ($6.95) per decatherm, for a net cost of cover of One and 17/100 Dollars ($1.17). See Def.'s Summ.J.Mem., Ex. L. Plaintiff failed to rebut Defendant's claimed November 2000 damages. Therefore, the Court multiplies the number of decatherms of cover gas purchased in November 2000 by the net cost of cover (72,304 × $1.17) and awards Defendant Eighty–Four Thousand Five Hundred Ninety–Five and 68/100 Dollars ($84,595.68) in damages for November 2000 cover costs.

### b. December.

■ At the outset, Plaintiff argues that Defendant failed to mitigate its December cover costs because: (1) Defendant could have accepted Plaintiff's November 29, 2000 offer of Six and 35/100 Dollars ($6.35) per decatherm and (2) Defendant purchased December 2000 gas using the riskier daily market. The volatile nature of the natural gas market makes Plaintiff's mitigation arguments unpersuasive. Within the gas market, every purchase is risky and speculative. Accepting Plaintiff's mitigation argument requires this Court to accept conclusions based upon perfect hindsight. "The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." OHIO REV.CODE § 1302.86, 1961 Official Comment ¶ 2 (West 2002). Plaintiff failed to provide sufficient evidence for this Court to conclude that Defendant acted in bad faith or in an unreasonable manner. Therefore, Plaintiff's mitigation argument must fail.

Calculating Plaintiff's liability for Defendant's purchase of cover gas in December 2000 is a more complex matter, because several important variables from the previously applied formula are missing. For example, a December contract price was

never finalized. The parties set a base price in the contract that was supposed to be increased by the addition of a basis and margin during bid week, the last week in November. Because the parties' dealings eroded in mid-November, the final price was never set.

Pursuant to the Agreement, we know that Defendant purchased three hundred ten thousand (310,000) decatherms of gas, however, we cannot calculate the net cost per decatherm, at this juncture, because reasonable minds could disagree on the December 2000 cover price. Defendant paid several different prices for gas in December 2000, ranging from Six and 85/100 Dollars ($6.85) to Ten and 15/100 Dollars ($10.15) per decatherm. Defendant proposed that an average of all of the prices paid should be used as the cover price, however Defendant's calculation of the average price does not match the Court's calculation of the average. *See* Def.'s Summ.J.Mem., Ex. O.[5] Plaintiff proposes that the Court ignore the cover price actually paid by Defendant and instead calculate cover costs based upon Defendant's last offered price during bid week. *See* Pl.'s Mem. Contra, Ex. C, Calculation # 4. Weighing the evidence in favor of the non-moving party, reasonable minds could come to different conclusions about how to calculate Defendant's contract and cover prices for December 2000. Accordingly, this Court concludes that an evidentiary hearing shall be set to determine the amount of December 2000 cover damages for which Plaintiff is liable.

### c. *Attorneys' fees and costs.*

■ Plaintiff seeks attorneys' fees and costs. Generally, in cases brought under federal law, the "American Rule" is followed. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Under the American Rule, "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Id.*

■ Exceptions to the American Rule exist. For example attorneys' fees are recoverable when there exists: (1) specific statutory authority; (2) a contractual right or (3) aggravated conduct (*i.e.,* willful disobedience of a court order or bad faith). *See Alyeska,* 421 U.S. at 257–58, 95 S.Ct. 1612 (citations omitted); *see also In re Monclova Care Ctr., Inc.,* 254 B.R. 167, 179 (Bankr.N.D.Ohio 2000) (citation omitted). Defendant seeks attorneys' fees, in this case, based upon Plaintiff's violation of the automatic stay imposed upon these proceedings.

■ Section 362(h) of the Bankruptcy Code states that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees[.]" 11 U.S.C. § 362(h). This Court and others have interpreted § 362(h)'s use of the term "individual" to preclude recovery of attorneys' fees by a corporation. *See In re LTV Steel Co., Inc.,* 264 B.R. 455, 463 (Bankr.N.D.Ohio 2001) (concluding that the term "individual" contained in § 362(h) refers only to natural persons and not corporate entities); *see also Maritime Asbestosis Legal Clinic v. LTV Steel Co., Inc.* (*In re Chateaugay Corp.*), 920 F.2d 183, 186–87 (2d Cir.1990) (holding that a bankruptcy court may only impose sanctions pursuant to § 362(h) for debtors who are natural persons). In this case, Debtor/De-

---

**5.** Defendant's Exhibit O lists four prices paid in December 2000: $6.85, $10.15, $9.12258 and $8.83952. Yet, Defendant concludes that the average price paid in December 2000 was $9.12258. By the Court's calculations, adding all four of the December prices ($6.85 + $10.15 + $9.12258 + $8.83952) and dividing by four equals an average price of $8.740525 per decatherm.

**242**

fendant is a corporation. Therefore, this court is precluded from awarding attorneys' fees and costs pursuant to § 362(h).

## CONCLUSION

For the reasons stated above, the Court sustains in part and overrules in part Defendant's summary judgment motion. The Court concludes that Plaintiff's claim does not qualify for administrative expense priority. The parties' agreement that Plaintiff is not a public utility renders Plaintiff's claim involving its public utility status moot and without controversy. Moreover, the Court concludes that post-petition Plaintiff breached an enforceable executory contract for the sale of natural gas. Accordingly, the Court finds Plaintiff liable for damages, pursuant to Ohio Revised Code §§ 1302.85(A) and 1302.86(A). Although Defendant is not eligible for attorneys' fees and costs, Plaintiff is liable to Defendant for damages in the amount of Eighty–Four Thousand Five Hundred Ninety–Five and 68/100 Dollars ($84,595.68) for costs incurred in the purchase of cover gas during November 2000. Plaintiff is also liable for the costs that Defendant incurred in the purchase of cover gas in December 2000, however the record lacks evidence sufficient to calculate this amount. Therefore, if parties cannot agree to the amount of December 2000 cover costs, then Defendant shall contact the Court within thirty (30) days to schedule an evidentiary hearing.

An appropriate order shall enter.