**In re LUCRE, INC., a Michigan corporation, Debtor.**

**No. HG 05–21732.**

United States Bankruptcy Court, W.D. Michigan.

March 20, 2006.

Michael S. McElwee, Esq., Grand Rapids, MI, Robert F. Wardrop II, Esq., Grand Rapids, MI, Kenneth C. Hoogeboom, Esq., Grand Rapids, MI, for the Debtor.

Dawn R. Copley, Esq., Ann Arbor, MI, for SBC.

## OPINION RE: SBC'S JANUARY 17, 2006 MOTION

JEFFREY R. HUGHES, Bankruptcy Judge.

On January 17, 2006, Michigan Bell Telephone Company d/b/a SBC Michigan ("SBC") filed its motion for relief from the automatic stay with respect to its interconnection agreement with Lucre, Inc. Among other things, SBC requests that the automatic stay be modified so that it may attempt to dissolve state court injunctions that are currently preventing SBC from discontinuing services to Lucre notwithstanding Lucre's alleged breach of the agreement. I am granting SBC's motion for the reasons stated in this opinion.

### BACKGROUND

Lucre provides telecommunication services to its customers. SBC furnishes Lucre the use of its network and other services and SBC in turn purchases from Lucre some of the services Lucre generates. Unfortunately for Lucre, SBC is also one of Lucre's competitors.

The relationship between SBC and Lucre arose because of the Telecommunications Act of 1996.[1] The telecommunications industry has been traditionally a monopoly at the local level because of the tremendous capital outlay associated with establishing and maintaining a compre-hensive service network. The Telecommunications Act of 1996 is designed to open up these monopolies by compelling existing telecommunication companies like SBC to make their networks available to competitors like Lucre. Consequently, it is hard to imagine SBC as being anything more than a grudging partner to this relationship. Indeed, Lucre accuses SBC of sabotaging it from the outset by improperly billing Lucre, by denying Lucre critical data, and by withholding revenue Lucre has earned.

The arrangement between SBC and Lucre is memorialized in what is known as an interconnection agreement. Although complicated, the agreement is nonetheless a contract and therefore subject to general contract law. However, the interconnection agreement is also subject to regulatory authority. In this instance, that authority is the Michigan Public Service Commission ("MPSC").

The ongoing friction between SBC and Lucre has resulted in several proceedings before the Kent County Circuit Court[2] and the MPSC. One of the MPSC proceedings resulted in a mediated order and the other resulted in a contested order. The contested order, which was issued on August 1, 2005, directed Lucre to pay SBC $1,336,561.67 for past services rendered by SBC under the interconnection agreement. However, that matter was still pending before the MPSC when Lucre filed its bankruptcy petition because Lucre had filed a timely motion for re-hearing with the MPSC.

Lucre initiated both of the Kent County Circuit Court actions because SBC was

---

1. Pub.L. No. 104–104, February 8, 1996, 110 Stat. 56.

2. The circuit court is the highest trial court within Michigan's judicial system. A particular circuit court has jurisdiction over one or more counties.

threatening to terminate services under the interconnection agreement. The first action, which was commenced in 2004 (the "2004 Kent County action"), resulted in the circuit court's issuance of a preliminary order enjoining SBC from terminating services to Lucre. That injunction remains in place today. However, SBC claims that the MPSC order for $1,336,561.67 eliminates the basis for that injunction. Therefore, SBC had requested the circuit court to dissolve its injunction. The hearing concerning that request was scheduled for October 21, 2005. Coincidentally, Lucre filed its Chapter 11 petition on the same day.

Lucre commenced the second Kent County Circuit Court action in 2005 (the "2005 Kent County action") because SBC was threatening to terminate other services provided by SBC under the interconnection agreement. The circuit court in the 2005 Kent County action issued a second preliminary order that also enjoined SBC from terminating various services. The final hearing concerning that injunction was scheduled for October 31, 2005. Lucre's Chapter 11 proceeding has also stayed the resolution of the 2005 Kent County action. Therefore, SBC remains subject to both injunctions.

SBC has continued to provide services to Lucre post-petition. However, the Chapter 11 proceeding has not abated the contentious nature of their relationship. Lucre asserts that it owes nothing to SBC for post-petition services rendered because Lucre itself has provided post-petition services to SBC under the interconnection agreement that Lucre claims exceed those provided by SBC. However, SBC asserts that it is still owed approximately $96,000 for post-petition services in excess of what Lucre has furnished in exchange.

SBC filed its motion for relief from stay on January 17, 2006. That motion requests that the automatic stay be modified so that SBC may proceed with its efforts in the Kent County Circuit Court to dissolve the two preliminary injunctions and so that SBC may otherwise take whatever steps are necessary to terminate its interconnection agreement with Lucre. SBC also wants the automatic stay modified so that it may setoff pre-petition and post-petition obligations owing by Lucre to it against pre-petition and post-petition obligations that SBC still owes to Lucre. The contemplated setoff would include the recovery by SBC of monies that have been paid into an escrow account by Lucre in connection with the preliminary injunction entered in the 2004 Kent County action.

I first heard SBC's motion on February 16, 2006. That hearing was then adjourned to March 9, 2006. Both parties submitted briefs and presented argument at the hearings.[3]

SBC indicated at the final hearing and again at the adjourned hearing that all it wants at this juncture is to be relieved of the ongoing burden of having to perform under the interconnection agreement. In other words, SBC is not seeking at this time the further relief necessary to allow it to actually terminate the agreement or to exercise its setoff rights. Therefore, the focus of the hearings was only upon this one aspect of the relief that SBC has requested.

### DISCUSSION

█ Lucre agrees that its relationship with SBC is contractual although that rela-

---

**3.** The March 9, 2006 hearing was adjourned to March 30, 2006 to give me the opportunity to consider further the arguments made at that hearing. I have now had the opportunity to consider those arguments and I have determined that a further hearing on March 30, 2006 is unnecessary.

tionship is circumscribed by the regulatory authority of the MPSC and the Telecommunications Act of 1996. Moreover, Lucre agrees that the relationship is executory as that term is used in bankruptcy parlance.

> An executory contract evidences a relationship between two parties in which both parties are contractually obligated to deliver goods or services for the benefit of the other. **An executory contract has two key characteristics:**
>
> a. Each party has obligations under the contract which remain unperformed at the time of the debtor's bankruptcy petition; and
>
> b. **The nature of each party's unperformed obligations under the contract are of sufficient importance such that the party's failure to perform those remaining obligations would constitute a material breach of the contract, thereby excusing the other party from performing its remaining duties.** *Terrell v. Albaugh (In re Terrell),* 892 F.2d 469, 471 (6th Cir.1989).

*In re Palace Quality Services Industries,* 283 B.R. 868, 881 n. 12 (Bankr.E.D.Mich. 2002) (emphasis added).

■ The right of one party to cease performing under an agreement if the other party is in material breach is fundamental to any contract where both parties have ongoing performance obligations.

> Except as stated in § 240, it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.

Restatement (Second) of Contracts § 237 (1979). *See, also,* MICH.COMP. LAWS § 440.2703 and 13 Arthur Corbin on Contract, § 68.2 (Rev. ed.2003).[4]

In this instance, SBC contends that Lucre was in material breach of the interconnection agreement prior to the commencement of Lucre's Chapter 11 proceeding. SBC's contention is supported by the MPSC's pre-bankruptcy order declaring that Lucre is indebted to SBC in the amount of $1,336,561.67 for past services.

■ Lucre, of course, disputes the MPSC ruling and in fact has asked the MPSC for another hearing. However, the nature of an executory contract is such that performance may be withheld even if there is not a material default by the other party. That is, it is always in the discretion of a contracting party to withhold performance for any reason or no reason at all, for contracts in reality are nothing more than voluntary arrangements between two or more consenting parties. Performance is certainly expected. Moreover, damages will be assessed if performance is wrongfully withheld. However, it is on only rare occasions that a court will intervene and actually compel the breaching party to perform what it had agreed upon. "The common law has always been reluctant to force contract breachers to perform their promises, and the equitable remedy of specific performance has rarely been allowed." 1 Roy Anderson, Damages Under the Uniform Commercial Code § 1:4 (2005) (citing Schwartz, The Case for Specific Performance, 89 Yale LJ 271 (1979) and Kronman, Specific Performance, 45 U. Chi. L.Rev. 351 (1978)).

---

4. Take, for example, a requirements contract where A is to provide parts to B at periodic intervals over an extended period of time in exchange for B's periodic payment for the parts supplied. A would be excused from its obligations to continue supplying parts under the contract if B defaulted on the required payment for parts previously supplied. Conversely, B would be excused from making further payments on the contract if A failed to provide parts as promised.

It appears that the matter before me is one of those rare cases. The Kent County Circuit Court has now ordered SBC to continue providing services to Lucre under the interconnection agreement notwithstanding the fact that SBC does not care to. Perhaps it is not too surprising that the injunctions were entered. After all, Lucre has struck a Faustian bargain where its survival now depends upon SBC's good graces. Moreover, the fact that Lucre is undoubtedly an unwelcome competitor in a territory SBC once claimed as its own offers motive for SBC to withhold performance based upon questionable pretexts. Consequently, it makes sense that the Kent County Circuit Court would enter orders enjoining SBC from terminating services pending a determination as to whether SBC is in fact justified in withholding further service from Lucre.

What is questionable is Lucre's subsequent effort to use the Bankruptcy Code to give permanency to what had only been preliminary injunctions issued by the Kent County Circuit Court. Lucre justifies its position with two arguments. First, Lucre asserts that the Bankruptcy Code itself requires SBC to continue performing under the terms of the interconnection agreement separate and apart from the prior orders entered by the state court. Second, Lucre asserts that the automatic stay imposed through its voluntary Chapter 11 petition bars SBC from proceeding further with its request to dissolve those injunctions. Both of these arguments warrant close examination.

■ Lucre argued at the hearing that the interconnection agreement became property of the estate upon the commencement of its case. 11 U.S.C. § 541(a)(1).[5] Consequently, Lucre contends that SBC is stayed from tampering with that "property" through the cessation of its performance thereunder. Lucre is correct in the sense that the commencement of its case affected its agreement with SBC. However, the effect was not to transfer the entire contract to the resulting bankruptcy estate. Rather, only Lucre's rights under the interconnection agreement transferred to the bankruptcy estate. SBC's rights under that agreement remained with SBC.

*Palace Quality Services* sets forth in detail how Section 541 affects both unexpired leases and executory contracts:

> It is well settled that a debtor's interest as a lessee in an unexpired lease (*i.e.*, a leasehold interest) is property of the estate. *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 702 (Bankr.S.D.N.Y.1992); *In re Alert Holdings, Inc.*, 148 B.R. 194, 203 (Bankr. S.D.N.Y.1992). *See also*, Collier on Bankruptcy App.P. 4–1505 (Lawrence P. King 15th ed. rev.1997). However, what many courts appear to miss in their acknowledgment that a debtor's leasehold interest is property of the estate is that Section 541(a)(1) only creates for the bankruptcy estate that which the debtor herself had as of the petition date:

**§ 541. Property of the estate.**

> (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all of the following property, wherever located and by whomever held:

---

**5.** The Bankruptcy Code is set forth in 11 U.S.C. §§ 101–1532. Unless otherwise noted, all further statutory references are to the Bankruptcy Code.

Lucre filed its petition on October 21, 2005. Therefore, the Bankruptcy Abuse Protection and Consumer Protection Act of 2005, which became effective on October 17, 2005 ("BAPCPA"), applies.

(1) Except as provided in subsection (b) and (c)(2) of this section, **all legal or equitable interests of the debtor in property** as of the commencement of the case.

11 U.S.C. § 541(a)(1) (emphasis added).

In other words, Section 541(a)(1) is simply a mechanism to transfer to the bankruptcy estate whatever interests the debtor has in property as of the date of her petition so that these interests may be administered by the trustee. *See, Talbert v. City Mortgage Services (In re Talbert)*, 268 B.R. 811 (Bankr. W.D.Mich.2001).

The effect of the Section 541(a)(1) transfer is neutral. The newly created estate receives no more or no less under Section 541(a)(1) than what the debtor had to transfer.

> Though this paragraph will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to pursue that claim, because he too would be barred. He could take no greater rights than the debtor himself had.

Collier on Bankruptcy App.P. 4–1505–06 (Lawrence P. King 15th ed. rev.1997).

A leasehold interest which is acquired by the bankruptcy estate from the debtor is no less subject to this "neutral transfer" principle than any other property interest held by the debtor. If the debtor is obligated to pay an agreed rental fee as a condition to possessing property which is owned by the lessor, then the bankruptcy estate must also be subject to that same obligation as a con-

dition to the estate's continued possession of that property. Otherwise, the bankruptcy estate would have rights in the leased property greater than those which the debtor had to transfer pursuant to Section 541(a)(1). Put simply, Section 541(a)(1) offers the trustee no independent right to remain in possession of leased property acquired from the debtor. Whatever right the trustee has under Section 541(a)(1) must derive from the debtor. Therefore, the estate must be bound by the same lease terms as those which bound the debtor prepetition.

The validity of this "neutral transfer" principle is even more apparent when the Section 541(a)(1) transfer of an executory contract is considered. For example, assume that A promises to deliver to B an automobile on August 10th and B promises to pay A $20,000 upon delivery. If B filed for Chapter 7 bankruptcy relief on August 8th, Section 541(a)(1) would transfer to the bankruptcy estate all of B's interests in property, including his rights in what is clearly an executory contract with A. However, the trustee would have no more right under Section 541(a)(1) to compel A to deliver the automobile without also tendering the $20,000 due upon delivery than B itself would have had had he elected not to file a bankruptcy petition and had B demanded delivery without tender of payment. If the trustee's interest in the automobile contract is limited by B's duties under that contract, then the trustee's interest in a leasehold interest must be similarly limited by the debtor's duties under the terms of the lease agreement.

*Palace Quality Services*, 283 B.R. at 880–81 (footnote omitted).

■ The corollary of the Section 541 "neutral transfer" rule is that the trustee

or debtor-in-possession can have no greater or different rights than the debtor with respect to an executory contract or unexpired lease unless the Bankruptcy Code itself provides those rights. If the Bankruptcy Code is silent, then the trustee or debtor-in-possession is subject to the same laws and regulations as those that had constrained the debtor pre-petition.

The distorting effect of the Bankruptcy Code upon outcomes which would otherwise be expected outside the context of bankruptcy at times gives bankruptcy law the aura of an "Alice through the Looking Glass" world. The temptation is to treat matters involving a bankruptcy as being governed by a set of rules which bears little resemblance to the rules which govern behavior and relationships when a bankruptcy is not involved. However, bankruptcy proceedings do not transpire in some exotic land which is exempt from the laws which govern the rest of the world. A bankruptcy estate is a legal entity. Like any other legally recognized entity, a bankruptcy estate is capable of owning and conveying property. A bankruptcy estate can enter into binding contracts. A bankruptcy estate can be liable for tortious conduct.

A bankruptcy estate does not engage in these activities in a vacuum. Rather, its activities are proscribed by the very same laws as those which regulate the activities of other legal entities which own property and which engage in business transactions. The only difference is that the outcome of activities which involve a bankruptcy estate may also be affected by the Bankruptcy Code itself. Consequently, it is incorrect to consider bankruptcy matters as being governed exclusively by the Bankruptcy Code and whatever "common law" the courts may have enacted in conjunction with that Code. Instead, the Bankruptcy Code should be treated as simply a filter which must be used when a bankruptcy petition is filed to reassess an already existing framework of laws and regulations.

*In re Macomb Occupational Health Care, LLC,* 300 B.R. 270, 283 n. 11 (Bankr. E.D.Mich.2003).

■ The question, then is what, if any, section of the Bankruptcy Code empowers Lucre, as debtor-in-possession, to compel SBC to continue performance under the interconnection agreement notwithstanding Lucre's alleged pre-petition breach of the agreement? [6] Section 365, which is the Bankruptcy Code section devoted to the bankruptcy estate's administration of executory contracts and unexpired leases, is a logical place to look for an answer. Unfortunately, the courts have tended to read into Section 365 more than that section actually provides. Section 365 is in fact simply a conglomeration of various rules relating to the post-petition assumption and rejection of executory contracts and unexpired leases. *Palace Quality Services* explains these rules in the context of an unexpired lease.

Section 365 is also devoid of any provision which authorizes the trustee to temporarily rewrite the terms of a leasehold interest inherited by the trustee from the debtor pursuant to Section 541(a)(1). Courts frequently look to Section 365 as the only provision within the Bankruptcy Code which is relevant to executory

---

**6.** A more interesting question arises when the other party has already withheld performance because of a material breach when the debtor files its Chapter 11 petition. The question then is what authority is there under the Bankruptcy Code for the newly-minted debtor-in-possession to compel the other party to **resume** performance when the other party was justified in withholding that performance only the day before?

contracts. However, Section 365 in fact addresses only one aspect of executory contracts and unexpired leases, their post-petition assumption or rejection.

Section 365 is nothing more than a set of rules concerning various issues which arise in connection with the trustee's decision to permanently retain (*i.e.,* assume) the debtor's rights under an executory contract or unexpired lease or to abandon (*i.e.,* reject) those rights because they are too burdensome or are of inconsequential value. Under the former Bankruptcy Act, assumption of an executory contract or unexpired lease was necessary for the contract or lease to become property of the estate. However, under the Bankruptcy Code, executory contracts and unexpired leases automatically become part of the bankruptcy estate at the inception of the bankruptcy proceeding. 11 U.S.C. § 541(a)(1). The trustee has the authority under Section 363(b) or (c) to use the property subject to the leasehold interest acquired from the debtor, subject, of course, to the corresponding obligation of the trustee to honor the terms of that lease or contract. The trustee also has the ability to remove the executory contract or unexpired lease from the estate's assets by exercising her abandonment power. 11 U.S.C. § 554(a). As for the lessor of an unexpired lease, it looks to Section 362(d)(1) for relief from the automatic stay to repossess the subject property from the estate.

Section 365 supplements these other sections of the Bankruptcy Code with 15 separate subsections. However, none of these subsections permit the trustee to ignore the terms of an executory contract or unexpired lease during the post-petition interval when she is deciding whether to assume or reject it. Subsection (a) empowers the trustee to assume or reject executory contracts and unexpired leases subject to court approval. Subsection (b) empowers the trustee to compel performance by the other party to the contract or lease notwithstanding debtor's or the trustee's default provided certain conditions are met. Subsection (c) sets forth the types of executory contracts and unexpired leases which the trustee cannot assume. Subsection (d) balances the trustee's interest in having sufficient time to decide whether to assume or reject the contract or lease with the competing interests of the non-debtor party to an executory contract and the lessor in an unexpired lease to know whether they will ultimately be bound or not to the contract or lease. Subsection (e) describes provisions in a contract or lease which may not be used to modify or terminate the contract or lease post-petition. Subsections (f), (k), and (*l*) set forth the circumstances under which a trustee may assign an executory contract or unexpired lease and the effect of any such assignment upon the estate. Subsection (g) establishes rules concerning the administration of claims resulting from the trustee's decision to reject an executory contract or unexpired lease. Subsections (h), (i), and (j) define the rights of a lessee of real property or a purchaser of real property (or timeshare thereof) in the event the debtor was the lessor or seller and the trustee elects to reject the lease or purchase contract. Subsection (m) defines leases of real property to include any rental agreement to use real property. Subsection (n) sets forth the rights of a non-debtor licensee to a license which was issued by the debtor and which the trustee has ultimately elected to reject. Finally, subsection (*o*) addresses the trustee's assumption of a debtor's commitment to maintain capital requirements for an insured depositing institution.

*Palace Quality Services,* 283 B.R. at 883–84 (footnotes omitted).[7]

As for the question posed in this case, Section 365 does provide an answer: assumption. Specifically, Sections 365(a) and (b) permit a debtor-in-possession to cure the pre-petition default excusing the other party from continued performance under the executory contract.

> (a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-

>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default[.]

> \*     \*     \*     \*     \*     \*

11 U.S.C. § 365(a) and (b).[8]

However, with one exception, there is nothing in Section 365 that permits the trustee or debtor-in-possession to compel performance from the other party prior to actually assuming that contract pursuant to Section 365(a). Indeed, assumption itself does not guarantee performance by the other party. It simply means that the other party no longer can excuse its refusal to perform based upon the debtor's prepetition breach.

The one exception is Section 365(b)(4).

> (b)(4) Notwithstanding any other provision of this section, if there has been a default in an unexpired lease of the debtor, other than a default of a kind specified in paragraph (2) of this subsection, the trustee may not require a lessor to provide services or supplies incidental to such lease before assumption of such lease unless the lessor is compensated under the terms of such lease for any services and supplies provided under such lease before assumption of such lease.

11 U.S.C. § 365(b)(4).[9]

It is worth noting that Section 365(b)(4) applies only to unexpired leases[10] and then only to incidental performance obligations

---

**7.** This case was filed after the Bankruptcy Abuse Protection and Consumer Protection Act of 2005 ("BAPCPA") became effective and *Palace Quality Services* was written prior to BAPCPA's enactment. BAPCPA revised subparts (b), (c), (d), and (f) of Section 365. It also added a new subpart (p). However, BAPCPA's changes to Section 365 did not expand its scope beyond what it had been, that being the post-petition assumption and rejection of executory contracts and leases.

**8.** The balance of Section 365(b)(1)(A) was added by BAPCPA. It permits the trustee to assume an unexpired lease of real property without curing defaults of non-monetary obligations under certain circumstances.

**9.** Interestingly, Section 365 includes three other provisions where it is the debtor, not

the other party to the contract or unexpired lease, who has the affirmative duty to continue performance post-petition. *See,* 11 U.S.C. §§ 365(d)(3), (d)(5), and (n)(4).

**10.** Although both executory contracts and unexpired leases are covered by Section 365, they are not the same. Unlike an executory contract, a lease no longer is executory once the landlord has delivered possession of the premises to the tenant. An executed lease is in effect a unilateral contract whereby the landlord agrees to refrain from seeking recovery of the premises in exchange for the tenant's promise to pay rent and to honor its other covenants. Of course, an unexpired lease could include executory elements as well were the landlord to also agree to provide services or supplies incidental to the lease.

associated with the lease. If anything, Section 365(b)(4) proves by exception the rule that a trustee or debtor-in-possession cannot otherwise demand performance from the other party to the contract when the debtor's pre-petition breach under the contract remains uncured. In other words, there is no reason for including Section 365(b)(4) in the Bankruptcy Code if, as Lucre would have it, pre-petition defaults are irrelevant to begin with.

■ Lucre conceded at the hearing that Section 365 is not the solution to its problem. Consequently, Lucre focused instead on the automatic stay. Specifically, Lucre asserted that SBC would be violating Section 362(a)(6) if it did not provide post-petition services under the interconnection agreement.

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, . . . operates as a stay, applicable to all entities, of—
>
>> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

11 U.S.C. § 362(a)(6).

Lucre's argument is that SBC's refusal to perform under the interconnection agreement can only be explained by SBC's desire to recover what SBC is owed by Lucre pre-petition. Therefore, according to Lucre, SBC's refusal to perform constitutes a violation of the automatic stay.

There are several problems with this argument. The inference that Lucre advocates is not the only inference that can be drawn from SBC's refusal to perform post-petition. Granted, the reason for refusing to perform even when the bankruptcy estate is offering C.O.D. terms for post-petition performance could be the party's desire to recover its pre-petition claim. However, there could be other reasons as well: the debtor's performance has been poor; a competitor is offering a better deal; the other party simply doesn't do business with Chapter 11 debtors. Of course, the other party to an executory contract may ultimately have no choice but to perform under the contract if the debtor, as debtor-in-possession, cures the pre-petition default and otherwise meets the requirements for assumption under Section 365. However, as already discussed, the debtor can regain that advantage with the other party only if the executory contract is in fact assumed. Until that point, the advantage remains with the other party.[11]

The specific language of Section 362(a)(6) also presents a problem, for that subsection stays only an "act to collect, assess or recover a claim." An "act" is defined as "the doing of a thing." Webster's Ninth New Collegiate Dictionary. However, in this instance, SBC is not accused of doing anything. To the contrary, Lucre's complaint is that SBC is doing nothing. Indeed, what Lucre wants is for SBC to perform notwithstanding SBC's belief that it has a legitimate basis not to perform.

---

11. It is worth at least noting that Lucre is not able to identify any specific act by SBC, either explicit or implicit, that would support Lucre's suggestion that SBC's motive for discontinuing service is to collect its pre-petition claim. Moreover, I am dubious as to whether such acts would constitute a violation of the automatic stay even had they occurred. For example, in the instant case, discussions between SBC and Lucre are inevitable if Lucre is to have any hope of resurrecting its relationship with SBC. An important topic in any such discussion, of course, will be cure of the pre-petition indebtedness. When, if ever, would that conversation cross the line from legitimate business negotiation to violation of Section 362(a)(6)?

Lucre's notion of adequate protection as justification for continuing whatever stay it is that restrains SBC from discontinuing performance under the interconnection agreement is also suspect. Adequate protection is defined in Section 361.

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by——

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

■ Lucre attempts to characterize as "adequate protection" its willingness to compensate SBC for whatever charges Lucre incurs post-petition on account of the interconnection agreement into this definition. However, each of the subparts of Section 361 reference protecting the value of the other entity's value in property. Protecting value makes sense in instances where the bankruptcy estate is in possession or control of property in which another party claims a lien or some other interest. A secured creditor or other interest

holder who is stymied by the automatic stay is entitled to adequate protection as compensation for the property's deterioration while it remains with the bankruptcy estate. However, the concept of protecting value through the award of adequate protection does not fit well in the realm of executory contracts. Granted, the debtor's rights under an executory contract are assigned to the bankruptcy estate as a consequence of Section 541. However, the bankruptcy estate's retention of the debtor's rights under the executory contract does not detract from the value of the other party's rights in the contract. Consequently, there is no need to "adequately protect" the other party's rights under Section 361.

■ What is pertinent to the other contracting party in a bankruptcy proceeding is the circumstances under which that party must continue to perform post-petition. Contract law, not Section 361, answers that question. Put simply, it is not enough for the trustee or debtor-in-possession to adequately provide for whatever post-petition performance the other party is to furnish under the executory contract if there is also a material pre-petition breach by the debtor, for the pre-petition breach in and of itself justifies continued non-performance by the other party regardless of what the debtor may offer as post-petition "adequate protection." The trustee or the debtor-in-possession must also cure the pre-petition default as part of a Section 365 assumption of the executory contract if it is to regain its right to demand performance from the other party.

■ This last observation underscores why Lucre's position is untenable. Lucre has postured the issue as one involving the withholding of services by SBC in exchange for collecting pre-petition debt so that Lucre can make its argument under

Section 362. However, what is really at issue is whether Lucre can, as debtor-in-possession, demand post-petition services from SBC under the pre-petition interconnection agreement between Lucre and SBC notwithstanding Lucre's pre-petition breach of that agreement. The mere commencement of the bankruptcy case and the attendant imposition of the automatic stay *do not by themselves empower a debtor,* as debtor-in-possession, to compel from the other party to an executory contract performance the day after the commencement of the bankruptcy case when the debtor had no right to compel that performance the day before. Consequently, it is illogical to contend that the non-debtor party's justifiable refusal to perform under an executory contract post-petition is somehow a violation of the automatic stay.

Lucre has cited a number of cases in support of its position. *Hertzberg v. Loyal Am. Life Ins. Co. (In re B & K Hydraulic Co.),* 106 B.R. 131 (Bankr.E.D.Mich.1989); *CIT Comm. Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.),* 406 F.3d 229 (4th Cir.2005); *Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.),* 127 F.3d 904 (9th Cir.1997); *Computer Comm., Inc. v. Codex Corp. (In re Computer Comm., Inc.),* 824 F.2d 725 (9th Cir.1987); *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.),* 440 F.3d 238 (5th Cir.2006). However, each of these cases involved the actual termination of an executory contract or unexpired lease. I agree that the automatic stay prohibits the non-debtor party to an executory contract from taking affirmative steps to terminate the bankruptcy estate's continuing rights under the executory contract it has acquired. Otherwise, the bankruptcy estate could easily be denied the opportunity afforded by Section 365 to cure the pre-petition defaults and to otherwise assume the executory contract as part of the bankruptcy process.

However, the question in this instance is not whether the stay will be modified so that SBC may actually terminate the interconnection agreement. Rather, the question is whether the bankruptcy estate can demand SBC to honor its obligations under the interconnection agreement when the bankruptcy estate, as assignee of Lucre's rights under that agreement, is also charged with Lucre's pre-petition breach of the agreement. SBC's unwillingness to perform on an agreement for which its failure to perform is excused does not violate the automatic stay nor does it impair Lucre's right as debtor-in-possession to avail itself of Section 365's curative powers. Indeed, it is only Lucre's pre-petition success in securing from the state court the two preliminary injunctions that makes the automatic stay even an issue.[12]

**12.** Lucre did find one case on point. *Interstate Gas Supply, Inc. v. Wheeling Pittsburgh Steel Corp. (In re Pittsburgh–Canfield Corp.),* 283 B.R. 231 (Bankr.N.D.Ohio 2002). Interstate Gas supplied large amounts of natural gas to Wheeling Pittsburgh pursuant to an executory contract. Plaintiff ceased making shipments when the debtor filed its bankruptcy petition.

Wheeling Pittsburgh sued Interstate Gas for damages based upon the difference between what it would have paid had Interstate Gas performed under the contract and what Wheeling Pittsburgh had to secure from other suppliers as cover. The court ruled that:

[d]uring the post-petition and pre-acceptance period, an executory contract remains in existence and is enforceable by, but not against, the debtor-in-possession. Until an executory contract has been rejected, generally a non-debtor must continue to perform.

*Pittsburgh–Canfield,* 283 B.R. at 238.

The *Pittsburgh–Canfield* court's statement is true as far as it goes. There is no question that a trustee or a debtor in possession may enforce an executory contract prior to assumption or rejection whereas the non-debtor party does not have the same right. Take again the example of an agreement by A to

Bankruptcy judges and practitioners alike are uneasy whenever a party advocates a position which, if accepted, would interfere with the debtor's ability to reorganize. After all, one of the objectives of Chapter 11 is to give the debtor some breathing space. In this instance, SBC's desire to withhold further services under the interconnection agreement jeopardizes not only Lucre's future but also other creditors' prospects of being repaid what they are owed. Consequently, there is the temptation to intervene in order to protect the integrity of the reorganization process.

However, the Sixth Circuit has observed in the context of Section 707(b) dismissals for substantial abuse that "there is no constitutional right to a bankruptcy discharge" and that "Congress, within the limits of the Constitution, is free to deny access to bankruptcy as it sees fit." *In re Krohn*, 886 F.2d 123, 127 (6th Cir.1989). These observations are equally applicable to this situation. Congress has not guaranteed all debtors success under Chapter 11. Nor has Congress guaranteed every debtor an equal opportunity to attempt a Chapter 11 reorganization. All that Congress has done is to set up a system within which all debtors can try. Whether a particular debtor succeeds or not is a function of its ability to overcome its own unique circumstances sufficiently to take advantage of the tools Congress has provided.

Lucre finds itself in the situation that it does because of its dependance upon an apparently unwilling contractual partner. There is no question that this dependance is constraining Lucre's ability to reorganize. However, the fact that SBC is an impediment to Lucre does not mean that I should skew the system Congress has created in order to increase Lucre's chances.

■ Lucre also complains that the leverage SBC is asserting is unfair. However, the Bankruptcy Code does not level all playing fields either. Its provisions do alter some outcomes. Providing for the cure of a pre-petition contract default under Section 365 when the contract itself does not allow for such a cure is one example. However, in many instances, the Bankruptcy Code leaves the debtor's fate to the vicissitudes of applicable non-bankruptcy law and the realities of the marketplace.

purchase an automobile from B for $20,000. If B files a bankruptcy petition before the sale is closed, B's bankruptcy estate becomes the assignee of B's right under the agreement. The bankruptcy trustee or even B if he is a debtor-in-possession would have the right to compel A to pay the $20,000 under the terms of the contract. However, A would not have the corresponding ability to compel B's bankruptcy estate to deliver the car in exchange for his $20,000. Rather, the bankruptcy estate would always have the right to reject the agreement, thereby leaving A with a pre-petition claim for whatever his damages might be. 11 U.S.C. § 365(g)(1).

What the *Pittsburgh–Canfield* court does not address is the issue of the bankruptcy estate's attempt to compel performance when there has also been a pre-petition breach by the debtor of the executory contract. There is some suggestion in *Pittsburgh–Canfield* that the executory contract in question was in fact only for the period after debtor's bankruptcy petition and, therefore, there was no pre-petition breach by the debtor that had to be addressed. *See, Pittsburgh–Canfield*, 283. B.R. at 239. In any event, neither the *Pittsburgh–Canfield* court nor any of the cases it cited in support of its proposition has adequately explained how a bankruptcy estate is able to ignore hornbook contract law and enforce an executory contract when the bankruptcy estate, as assignee of the debtor's right, is itself in default.

*Palace Quality* does offer an explanation as to why many courts have misinterpreted the post-petition operation of unexpired leases and executory contracts under the Bankruptcy Code. *Palace Quality*, 283 B.R. at 887–899. However, it is impossible to do it justice in a footnote.

Nor is Lucre's predicament unique. Many Chapter 11 debtors are compelled to make decisions at the outset of the proceeding that can have a profound effect upon their ability to later confirm a plan. Secured creditors with blanket liens on the debtor's cash collateral use that leverage to exact often unrealistic agreements from the bankruptcy estate because of the debtor-in-possession's desperate need to continue operations. "Critical" vendors likewise use their economic power over the debtor to secure payment of pre-petition debt through "first-day" orders. Indeed, the ability of critical vendors who do not have actual supply contracts with the debtor to refuse to continue doing business with the Chapter 11 debtor post-petition begs the question as to why it is supposedly wrong for a vendor who does have a supply contract to take advantage of a debtor's pre-petition breach to refuse future performance post-petition.

To summarize, neither Section 362 nor any other section of the Bankruptcy Code prohibits SBC from refusing to continue performance under the interconnection agreement because of Lucre's alleged pre-petition breach of that agreement. Therefore, SBC's motion for relief from stay with respect to that aspect of its current designs is moot. It is up to Lucre to establish that it, as debtor-in-possession, is entitled to continued post-petition service from SBC under the interconnection agreement notwithstanding Lucre's pre-petition breach, not vice-versa.

Lucre does have weapons in its arsenal to accomplish this task. First, there is assumption under Section 365(a). Lucre complains that it should not be forced to make this decision so quickly, for to do so would "eviscerat[e] the debtor-in-possession's right to determine whether adoption [sic] or rejection of an executory contract would be beneficial to an effective reorga-nization." *See,* Debtor's March 2, 2006 Supplemental Brief, p. 5 (Docket Entry No. 111). However, Lucre misunderstands its predicament. Nothing is prohibiting Lucre from exercising the right it espouses other than the exigencies of its own circumstances. Lucre has until confirmation to decide whether to assume or reject the interconnection agreement unless the court orders otherwise. 11 U.S.C. § 365(d)(2). Lucre is forced to accelerate this decision only because it needs some device to immediately overcome the fact that a material pre-petition breach of the agreement is impeding Lucre's ability to otherwise demand performance from SBC.

Lucre also has the option of commencing an adversary proceeding to enjoin SBC from withholding services. In fact, Lucre has already secured similar relief from the Kent County Circuit Court and it is the continuing affect of the preliminary injunctions issued by that court that forms the basis for why Lucre contends SBC should not be granted relief from the automatic stay.

Whether the automatic stay precludes SBC from seeking the dissolution of those injunctions without leave of this court is debatable. Section 362(a)(1) and perhaps Section 362(a)(6) appear to be the two provisions most applicable. The former prohibits:

(1) **the commencement or continuation,** including the issuance or employment of process, of a judicial, administrative, or other action or proceeding **against the debtor** that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

11 U.S.C. § 362(a)(1) (emphasis added).

Section 362(a)(6) in turn prohibits:

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

11 U.S.C. § 326(a)(6).

These provisions may indeed apply with respect to the 2004 Kent County action. Although Lucre commenced that action, SBC did file a counterclaim to recover payment. Consequently, dissolution of the preliminary injunction by SBC could arguably be a continuation of a pre-petition proceeding commenced by SBC against Lucre or an act to collect or recover the pre-petition debt SBC claims it is owed. However, there is no indication that SBC made a counterclaim against Lucre when Lucre filed its second complaint for injunctive relief with the Kent County Circuit Court in 2005. Consequently, it is difficult to understand how SBC's desire to dissolve the preliminary injunction imposed in that action would be a violation of either Section 362(a)(1) or 362(a)(6) provided SBC's purpose is only to release itself from having to continue rendering services to Lucre on a contract which SBC contends Lucre has breached.

▆▆▆ In any event, I find that cause exists to modify the automatic stay so that SBC may proceed with its efforts to relieve itself from the two injunctions. The state circuit court in each instance apparently enjoined SBC from discontinuing performance under the interconnection agreement so as to maintain the status quo pending a resolution of what was ultimately a dispute between the parties. It is unfair for Lucre to now use the automatic stay to galvanize what the state court had intended to be only preliminary. However, my modification of the stay is limited to only whatever is required of SBC to remove the Kent County Circuit Court's imprimatur compelling SBC to continue rendering services under the interconnection

agreement. I do not know what prompted the imposition of the injunctions in either instance and, therefore, I can only speculate as to what, if anything, short of a judicial determination as to whether Lucre is in fact in material breach would warrant dissolution of one or the other injunctions. Suffice it to say that if an actual determination must be made by the Kent County Circuit Court or the MPSC as to whether there has been a material breach by Lucre, then the automatic stay is modified so that the appropriate tribunal may make that determination.

I recognize that SBC now claims that Lucre, as debtor-in-possession, is also in default on its post-petition payment obligations to SBC and that its alleged post-petition default constitutes a separate justification for withholding performance. Therefore, I am further modifying the automatic stay to permit the Kent County Circuit Court and, if appropriate, the MPSC to adjudicate whether there has been a post-petition default if that court determines that such an adjudication is necessary with respect to continuing or discontinuing the injunctions imposed.

However, I am not at this time modifying the automatic stay with respect to any other action that SBC may be contemplating at this time concerning its relationship with Lucre. Specifically, the automatic stay continues to prohibit SBC from taking any action to terminate the bankruptcy estate's rights in the interconnection agreement assigned to it as a consequence of Lucre filing its bankruptcy petition. Again, SBC may at this time take whatever steps may be necessary to eliminate the injunctions preventing it from otherwise refusing performance because of Lucre's own alleged breaches under the interconnection agreement. However, SBC continues to be barred at this time by the automatic stay from acting upon Lucre's

**664**

breach to terminate altogether SBC's obligations under that agreement. SBC likewise continues to be barred by the automatic stay from exercising whatever setoff rights if asserts with balances it owes to Lucre pre-petition.

Denying SBC this further relief at this point is without prejudice. SBC reserves the right to file a new motion for additional relief at any time. SBC also reserves the right to file a Rule 9023 motion requesting that I proceed with considering additional modification of the automatic stay in conjunction with the pending motion.

Lucre in turn reserves the right to pursue further injunctive relief against SBC in this court. The automatic stay does not bar SBC from refusing further performance under the interconnection agreement. However, this court also has the authority to issue injunctions. Fed.R.Bankr.P. 7065. Indeed, Lucre might have sought from this court injunctive relief in the alternative had it not already secured similar relief in the 2004 and 2005 Kent County actions.

I would observe though that the pendency of the Kent County actions would seem to militate in favor of leaving consideration of what are essentially contract and regulatory issues with that court and the MPSC. The one issue that might suggest a different outcome is the Chapter 11 itself. While Lucre's ability to use Section 365(a) to cure whatever pre-petition default it may have with SBC is not in and of itself a basis to impose the automatic stay upon SBC's desire to withhold service, it may be a factor in considering whether it is appropriate to impose injunctive relief similar to that already imposed by the Kent County Circuit Court. For example, it is not out of the realm of possibility that a bankruptcy court would impose this type of injunction upon the other party in conjunction with a debtor-in-possession's motion to assume an executory contract so

that the debtor could be assured of still being in business at the point when the assumption is finally approved.

### CONCLUSION

For the reasons stated, SBC's motion to modify the automatic stay is granted to the extent provided in this opinion. I will issue a separate order consistent with this opinion. The order issued will be stayed for ten (10) days from the entry of that order. Fed.R.Bankr.P. 4001(a)(1).